**Ralph M. NOWAK, Administrator of the Estate of Sally Ann Nowak, and Individually; Nicholas M. Nowak, a minor, by Ralph M. Nowak, his father and next friend; and Nathan G. Nowak, a minor, by Ralph M. Nowak, his father and next friend, Plaintiffs,**

v.

**TAK HOW INVESTMENT LTD. d/b/a Holiday Inn Crowne Plaza Harbour View, Defendant.**

**Civ. A. No. 94–11691–WGY.**

United States District Court, D. Massachusetts.

Aug. 29, 1995.

26

Edward Fegreus, Boston, MA, for plaintiffs.

Alan B. Rubenstein, Rackemann, Sawyer & Brewster, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

This wrongful death diversity action tests the limits of the power of this Court to exercise in personam jurisdiction over an out-of-state defendant. It involves a resident of Massachusetts who accompanied her husband on a business trip to Hong Kong and drowned in the swimming pool of the hotel at which they lodged, allegedly due to the negligence of the hotel and its staff. Her widower and two children, also residents of the Commonwealth, now seek to hold the owner of the hotel accountable in Massachusetts. To do so, as is frequently the case in like situations, they must overcome the hotel's motion to dismiss for lack of personal jurisdiction and demonstrate the defendant's amenability to suit in this forum. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir.1995) (plaintiff bears burden of proving existence of jurisdiction).

## I. Background

Questions of personal jurisdiction require detailed examination of the particular circumstances of each case. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485–86, 105 S.Ct. 2174, 2189–90, 85 L.Ed.2d 528 (1985); *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995). Therefore, the largely undisputed facts of jurisdictional significance must here be set forth at some length. In deciding the instant motion, the Court employs the *prima facie* standard, considering "only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Boit v. Gar–Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir.1992); *see also Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995). The plaintiff may not rely on unsupported allegations in the pleadings, but the Court must accept all of the plaintiff's "properly supported proffers" of evidence as true. *Boit*, 967 F.2d at 675.

With that standard in mind, the Court bases its decision herein on the following facts:

Sally Ann Nowak ("Mrs. Nowak") was at all relevant times married to the plaintiff Ralph M. Nowak ("Mr. Nowak") and was the mother of their two minor children, the plaintiffs Nicholas M. and Nathan G. Nowak (collectively, the plaintiffs will be referred to as "the Nowaks"). The Nowaks lived in Marblehead, Massachusetts, and Mr. Nowak was employed as a Preliminary Design Manager in the Marketing Department of Kiddie Products, Inc. ("Kiddie") in Avon, Massachusetts. Kiddie develops, manufactures, and markets products for infants. As Kiddie engages in extensive business in Hong Kong, its executives frequently travel on business to the Crown colony. Mr. Nowak customarily made two such business trips each year, and was usually accompanied on one of those trips by Mrs. Nowak. Another Kiddie employee, Marie Burke ("Burke"), Administrative Assistant to the Vice President of Materials Management/Engineering, John N. Co-lantuone ("Colantuone"), was responsible for scheduling and reserving airline flights, hotel accommodations, and ground transportation for Mr. Nowak and other executives of the company on their trips to Hong Kong.

Kiddie's relationship with the Holiday Inn Crowne Plaza Harbour View (the "Hotel")[1] was initiated by Colantuone, who had been travelling to Hong Kong on Kiddie's behalf since 1982. Prior to 1992, Colantuone stayed at numerous other hotels while in Hong Kong two or three times a year, and first became aware of the Hotel through advertisements on Hong Kong radio sometime around 1983 or 1984. Colantuone later became dissatisfied with the rates and business services provided by the hotels he had been patronizing, conducted research on other possible candidates, and finally decided to try the Hotel in 1992.

Since that time, according to Burke, department employees travelling to Hong Kong have stayed exclusively at the Hotel because the company receives special corporate discount room rates and other benefits, such as complimentary conference rooms and the use of business facilities. Burke has reserved rooms at the Hotel for at least twenty Kiddie employees.

The trip resulting in Mrs. Nowak's death came about as follows. On June 28, 1993, Lana Yip ("Yip"), the Hotel's Commercial Sales Manager, solicited further business from the company by sending Colantuone a message by telecopier:

> It has been our pleasure serving you and your travelling executives at Holiday Inn Crowne Plaza Harbour View. May I take this opportunity to introduce our latest promotion program to you, which valid (sic) from now until 30 September 1993.... Thank you for your continuous support to our hotel and we look forward to welcoming you back soon.

Attached to the fax were two pages of promotional materials. One, entitled "Crowne Plaza Business Specials," promised a 35% discount "only for corporate discount holders," and listed the special rates available to

---

1. The Hotel is the sole asset of the defendant Tak How Investment Ltd. In this opinion, the Court will use the term "Hotel" to refer to both entities.

Kiddie for each of the types of rooms available. The second page listed all the benefits of staying on one of the Hotel's "Executive Floors."

Colantuone's assistant, Burke, responded to Yip's solicitation approximately two weeks later, expressing interest and requesting further information on rooms and rates. Yip promptly replied, and a series of faxes ensued in which Yip furnished Burke with extensive information and Burke eventually reserved rooms at the Hotel for Mr. and Mrs. Nowak; Colantuone and his wife; and three other Kiddie employees. From June 28 to August 25, 1993, Burke and Yip exchanged a total of sixteen messages—each party generating eight. Most of the telecopier traffic concerned changes to the reservations—primarily regarding the size and makeup of the Kiddie contingent and the accommodations desired—initiated by Burke. The final plan called for the Nowaks and the Colantuones to arrive at the Hotel on September 16, 1993.

The Nowaks allege the following in their complaint.[2] On September 18, 1993, Mr. and Mrs. Nowak were registered guests of the Hotel. At approximately 1:15 p.m., Mrs. Nowak was swimming alone in the Hotel pool. On duty as lifeguards were two employees of the Hotel, Ho–Piu Leung ("Ho") and Ping–Chee Tse ("Ping"). The Hotel had assigned Tse to watch the swimmers from poolside, while it was Ho's responsibility to monitor activity in the pool through a glass wall in the Hotel gymnasium. Ping left his post to go to the storeroom while Mrs. Nowak was "splashing and doing warm up exercises," and when he returned two to three minutes later, he saw Mrs. Nowak at the bottom of the pool. Ping called for Ho's assistance and then dove into the pool in an attempt to rescue Mrs. Nowak. Ping and Ho together pulled her from the pool, and they both observed that although she was not breathing, Mrs. Nowak had a pulse and her eyes were moving. They also noticed that she had vomited and had a small abrasion on the left side of her mouth.

Ping and Ho refused to administer "mouth-to-mouth" cardiopulmonary resusci-

tation because they were fearful of contracting an infectious disease and did not have a "mouth-to-mouth face guard," a cheap, portable device customarily carried and used by lifeguards and health care workers. Instead, the lifeguards attempted to revive Mrs. Nowak by using the "sylvester" method of resuscitation, an indirect form of ventilation involving manipulation of Mrs. Nowak's arms. This method is known to lifeguards as ineffective and inefficient, and in this case, with tragic results, it proved to be so. The Nowaks now seek to recover damages from the owner of the Hotel, alleging that its negligence caused Mrs. Nowak's death.

## II. Discussion

■ A determination of jurisdiction requires a tripartite analysis. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 144 (1st Cir.1995); *Pritzker v. Yari,* 42 F.3d 53, 60 (1st Cir.1994). Jurisdiction is proper only where 1) the claim directly arises out of or relates to the defendant's activities in the forum ("relatedness"); 2) the defendant has "purposefully availed" itself of the privilege of conducting business here; and 3) its assertion is reasonable in light of certain "Gestalt" factors, see section II(C), *infra. Foster–Miller,* 46 F.3d at 144. The Court will address each requirement separately.

### A  Relatedness

To understand the unique setting of this particular case, it may be helpful to engage in a brief overview of the development of the law as it pertains to the exercise of personal jurisdiction in this District over out-of-state and foreign hotels.

Under the Massachusetts long-arm statute,

[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... transacting any business in this Commonwealth.

MASS.GEN.LAWS ANN. 223A, § 3(a) (1985). In this circuit, reliance on this Massachusetts

---

**2.** As these alleged facts are not of jurisdictional significance, the Court need not, and therefore does not, at this stage express any opinion on their veracity.

statute originally proved of little value to Massachusetts residents injured while staying at out-of-state hotels. While plaintiffs could frequently prove various contacts by the defendants with Massachusetts which satisfied the "transacting any business" requirement, these cases invariably foundered on the statutory requirement that the cause of action must be one "arising from" the transaction of business in Massachusetts. *See Crocker v. Hilton Int'l Barbados, Ltd.,* 976 F.2d 797, 799 (1st Cir.1992); *Fournier v. Best Western Treasure Island Resort,* 962 F.2d 126, 127 (1st Cir.1992); *Pizarro v. Hoteles Concorde Int'l, C.A.,* 907 F.2d 1256, 1258–59 (1st Cir.1990); *Marino v. Hyatt Corp.,* 793 F.2d 427, 430 (1st Cir.1986). In *Marino,* a slip-and-fall case brought by a Massachusetts resident against a Hawaii hotel, the plaintiff had made reservations to stay at the hotel through a local travel agency. 793 F.2d at 427. Although the First Circuit concluded that the defendant had transacted business in Massachusetts, it held that jurisdiction would not lie under the long-arm statute because the cause of action did not arise out of Hyatt's in-state activities. The Court of Appeals explained that "plaintiffs' advance reservation agreement with Hyatt would hardly be an important, or perhaps even a material, element of proof in their slip and fall case." *Id.* at 430. In so holding, the court rejected the plaintiffs' attempt to characterize their negligence action as one sounding in contract based on the reservation agreement. *Id.*

The First Circuit affirmed *Marino* in *Pizarro,* a case in which the plaintiffs unsuccessfully attempted to invoke the jurisdiction of the district court in Puerto Rico over an Aruba hotel which had advertised in and solicited business from Puerto Rico.[3] 907 F.2d at 1257. The Court of Appeals explicitly rejected the plaintiffs' contention that the "arising out of" requirement was satisfied because "but for" the hotel's conduct within Puerto Rico, they would not have stayed at the hotel, and thus would not have suffered personal injuries. *Id.* at 1259. Analogizing to familiar concepts of tort law, the court

stated that the defendant's conduct was not the "legal or proximate cause" of the injury, and thus the injury did not arise out of that conduct. *Id.* at 1259–60. In *Fournier,* the First Circuit again adhered to *Marino* and declined to rethink its position in light of contrary authority from other circuits adopting a more liberal interpretation of the "arising from" requirement. 962 F.2d at 128 (citing *Lanier v. American Bd. of Endodontics,* 843 F.2d 901 [6th Cir.], *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 [1988]; *Prejean v. Sonatrach, Inc.,* 652 F.2d 1260 [5th Cir.1981]; and *Shute v. Carnival Cruise Lines,* 863 F.2d 1437 [9th Cir.1988], *withdrawn,* 872 F.2d 930 [9th Cir.1989], *modified,* 897 F.2d 377 [9th Cir.1990], *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 [1991]).

In January of 1994, this landscape was blurred, if not erased, by the decision of the Supreme Judicial Court of Massachusetts in *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 625 N.E.2d 549 (1994). In *Tatro,* the plaintiff, a Massachusetts resident attending a conference in Anaheim, California, slipped and fell in the bathtub at her hotel. After holding that the hotel transacted business in Massachusetts based on its broad range of solicitations and other activities within the state, *id.* at 767–69, 625 N.E.2d 549, the court went on to discuss whether Tatro's injury "arose from" those activities. Tatro argued that but for the hotel's solicitation and subsequent contact with her, the injuries would not have occurred. The court rejected the strict interpretation of *Marino* in favor of the liberal "but for" approach of *Prejean, Lanier,* and *Shute.* Jurisdiction was proper, so the Supreme Judicial Court said, because the reserving of a room in an out-of-state hotel "is considered the first step in a train of events that results in the personal injury." *Id.* at 770, 625 N.E.2d 549. The Massachusetts court relied on the rationales employed by the Fifth and Sixth Circuits:

> Logically, there is no reason why a tort cannot grow out of a contractual contact. In a case like this, the contractual contact

---

3. Puerto Rico's long-arm statute also requires that the plaintiff's cause of action arise out of the defendant's conduct within the forum state. P.R. Laws Ann. tit. 32, app. III, Rule 4.7(a)(1) (Supp. 1987); *Pizarro,* 907 F.2d at 1258.

is a "but for" causative factor for the tort since it brought the parties within tortious "striking distance" of each other.

*Id.* at 770, 625 N.E.2d 549 (quoting *Prejean,* 652 F.2d at 1270 n. 21).

[Under the Michigan long-arm statute,] a claim arises from a defendant's transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State.

*Id.* at 771, 625 N.E.2d 549 (quoting *Lanier,* 843 F.2d at 909); *see also Shute,* 897 F.2d at 383–86 (employing "but for" test and concluding tort claim may arise from contract). The Supreme Judicial Court concluded:

[This] approach is more consistent with the language of our statute and with decisions of this court interpreting it. There is no readily apparent basis in the statutory language ("arising from") for the restrictive proximate cause approach adopted by the First Circuit. . . . But for the defendant's solicitation of business in Massachusetts, and its agreement to provide the plaintiff with hotel accommodations in Anaheim, California, the plaintiff would not have been injured in a room of the hotel. We conclude that the requirements of [the long-arm statute] have been satisfied.

*Tatro,* 416 Mass. at 771–72, 625 N.E.2d 549.

Interpretation of the reach of the Massachusetts long-arm statute is, of course, only the first step in the jurisdictional analysis. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 144 (1st Cir.1995). Under the due process clause of the United States Constitution, there must also be present such minimum contacts with the forum that the exercise of personal jurisdiction over the defendant by this Court comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

Analysis of this constitutional dimension has become ever more complex in recent years. The seminal case in this circuit is

*United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080 (1st Cir.1992), in which the Court of Appeals explained:

In analyzing minimum contacts, we have recognized two types of personal jurisdiction: general and specific. General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state. . . . Specific personal jurisdiction may be asserted *where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.*

960 F.2d at 1088–89 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 1872–1873, 80 L.Ed.2d 404 [1984] and *Donatelli v. National Hockey League,* 893 F.2d 459, 462 [1st Cir. 1990] ) (emphasis supplied).[4]

Thus the constitutional prong of specific personal jurisdiction analysis requires an "arising out of" inquiry distinct from that undertaken under the Massachusetts long-arm statute. The current framework of that analysis, however, is not bereft of doubt. If the strict approach of *Marino, Pizarro,* and *Fournier* applies, notwithstanding its repudiation by the Supreme Judicial Court in the statutory context in *Tatro,* then jurisdiction in this case is dubious. Although one commentator has assumed this to be the case, see Mark M. Maloney, *Specific Personal Jurisdiction and the "Arise From or Relate To" Requirement . . . What Does It Mean?,* 50 WASH. & LEE L.REV. 1265, 1282–84 (1993) (calling the *Marino/Pizarro* standard the "substantive-proximate cause test"), and the First Circuit has used language arguably supporting this view, see *163 Pleasant Street,* 960 F.2d at 1089, the question was answered by a recent decision, *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201 (1st Cir. 1994). In that case, the Court of Appeals rejected the notion that its "substantive-

---

4. The Nowaks have neither demonstrated nor argued that the Hotel has engaged in such continuous and systematic activities in the Commonwealth to subject it to the general jurisdiction of

the Massachusetts courts. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 144 (1st Cir.1995). Therefore, the case must rise or fall on the applicability of specific jurisdiction.

proximate cause test" constituted an "innovative constitutional test," stating instead:

> In our view, these cases—which interpret the term "arising from" as that term is used in the long-arm statutes of Massachusetts ... and Puerto Rico ...—*deal with state-law issues and have no real implications for the relatedness requirement specifically or for constitutional analysis generally.*

*Ticketmaster*, 26 F.3d at 207 n. 8 (citing *Marino, Pizarro,* and *Fournier* ) (emphasis supplied); *see also Crocker v. Hilton Int'l Barbados, Ltd.,* 976 F.2d 797, 799 (1st Cir. 1992) (applying "crystal clear" precedent of *Marino* in determining inapplicability of Massachusetts long-arm statute). Therefore, given the Supreme Judicial Court's primacy in the interpretation of the statutes of Massachusetts, see *Sabetti v. Dipaolo,* 16 F.3d 16, 19 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 293, 130 L.Ed.2d 207 (1994), *Tatro* has apparently consigned the "arising out of" analysis of *Marino* and its progeny to the dustbin of First Circuit jurisprudence.

In its place is a far more liberal approach to relatedness, the "least developed prong of the due process inquiry." *Ticketmaster,* 26 F.3d at 206 ("We know to a certainty only that the requirement focuses on the nexus between the defendant's contacts and the plaintiff's cause of action"). The constitutional requirement of *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872, that the cause of action arise out of *or* relate to the in-state conduct "portends added flexibility and signals a relaxation of the applicable standard." *Id.; see also Pritzker,* 42 F.3d at 61 (jurisdiction proper where dispute would not have occurred "but for" contract representing defendant's in-state activities). The hallmark of relatedness analysis remains the element of causation. *Ticketmaster,* 26 F.3d at 207.

■ Applying this flexible standard to the case before it, the Court concludes that the causes of action asserted by the Nowaks arose out of or related to the Hotel's transac-

tion of business within the Commonwealth of Massachusetts under both the long-arm statute as interpreted in *Tatro* and the Constitution.[5] The Hotel's solicitation of Kiddie's business and the extensive back-and-forth resulting in Burke's reserving a set of rooms for Kiddie employees and their spouses set in motion a chain of reasonably foreseeable events resulting in Mrs. Nowak's death. The possibility that the solicitation would prove successful and that one or more of the guests staying at the Hotel as a result would use the pool was in no sense remote or unpredictable; in fact, the Hotel included the pool as an attraction in its promotional materials. The Nowaks' claim was "made possible by, [and] lies in the wake of" the Hotel's Massachusetts contacts. *See Tatro,* 416 Mass. at 771, 625 N.E.2d 549 (quoting *Lanier,* 843 F.2d at 909). In the Fifth Circuit's evocative phrase, the Hotel's conduct brought the parties within "tortious striking distance" of each other. *Prejean,* 652 F.2d at 1270 n. 21 (interpreting Texas long-arm statute). The Supreme Court has recognized that the formation of a contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King,* 471 U.S. at 479, 105 S.Ct. at 2185 (quoting *Hoopeston Canning Co. v. Cullen,* 318 U.S. 313, 316–17, 63 S.Ct. 602, 605, 87 L.Ed. 777 [1943] ). Here, the "future consequences" and "real object" of the Hotel's Massachusetts contacts was that Massachusetts residents left the state, travelled to Hong Kong, and used the Hotel's facilities. The relatedness requirement is thus constitutionally and statutorily satisfied.

### B. *Purposeful Availment/Minimum Contacts*

■ The next branch of jurisdictional analysis requires a determination whether the Hotel voluntarily "invok[ed] the benefits and protections" of Massachusetts law, thereby rendering foreseeable and reasonable its compelled presence before the courts in this

---

5. Given the liberal construction of the statute and the proffered evidence, there is no doubt but that the Hotel "transact[ed] any business" in the Commonwealth. *See Tatro,* 416 Mass. at 767–68, 625 N.E.2d 549 ("generally the purposeful and successful solicitation of business from residents of the Commonwealth" satisfies the requirement); *Hahn v. Vermont Law School,* 698 F.2d 48, 50–51 (1st Cir.1983). See also the discussion of purposeful availment in Section II(B), *infra.*

**32**

state. *See Pritzker v. Yari,* 42 F.3d 53, 60, 61 (1st Cir.1994); *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 207–208 (1st Cir.1994) (cornerstones of purposeful availment are foreseeability and voluntariness). The standard of purposeful availment is not rigorous, "casts a wide net," *Pritzker,* 42 F.3d at 62, and may be fulfilled by a single act. *See Burger King v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 2184 n. 18, 85 L.Ed.2d 528 (1985); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *Pritzker,* 42 F.3d at 61–63. The question narrows down to

> whether the commercial action taken, in light of the contacts with the forum state it entailed, amounts to a purposeful decision by the nonresident to "participate" in the local economy and to avail itself of the benefits and protections of the forum.

*Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 933–34 (1st Cir.1985); *see also Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 983 (1st Cir.1986); *Hahn v. Vermont Law School,* 698 F.2d 48, 51–52 (1st Cir.1983).

■ The Hotel's conduct within the state, as detailed above, is sufficient to support the Court's conclusion that the plaintiff has overcome the "purposeful availment" hurdle and demonstrated the minimum contacts necessary to justify the assertion of jurisdiction. The Hotel, through its agent, Yip,[6] reached into Massachusetts with an unprompted solicitation and sought to entice Massachusetts residents to leave the state and visit its Hong Kong facilities. Although the Hotel and Kiddie employees had done business together in the past,[7] the discrete series of events resulting in Mrs. Nowak's death were set in motion by the Hotel's solicitation of June 28, 1993. Even if the Nowaks or Kiddie had decided on their own to return to the Hotel and had contacted the Hotel to implement that intention, that fact would not necessarily compel a finding that the Hotel did not thrust itself into the Massachusetts economy and purposefully avail itself of Massachusetts law. *See, e.g., Carlson Corp. v. University of Vermont,* 380 Mass. 102, 109 n. 11, 402 N.E.2d 483 (1980) ("fact that the resident plaintiff may have initiated the entire business relationship is not a fact which is entitled to constitutional consideration"); *Good Hope Indus., Inc. v. Ryder Scott Co.,* 378 Mass. 1, 11, 389 N.E.2d 76 (1979) ("nondispositive is the fact that the plaintiffs made the initial solicitations with respect to these transactions").

The Nowaks have also proffered a good deal of evidence of other contacts within Massachusetts by the Hotel.[8] While there is

6. Given the nature of the corporate form and the legal fictions surrounding it, the out-of-state activities of an authorized agent may subject a corporation to personal jurisdiction in that state. *See United Elec., Radio and Mach. Workers of Amer. v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1090 (1st Cir.1992).

7. The Nowaks have submitted evidence that from early 1992 to the fall of 1994, at least twenty Kiddie employees visited the Hotel on at least eight separate trips at a cost of approximately $28,600. Over the same period, the Hotel received approximately $120,000 from at least 82 travelling Massachusetts residents. Although a portion of this activity occurred after Mrs. Nowak's death, these figures nonetheless demonstrate both that the Hotel meaningfully participated in the economy of Massachusetts in a purposeful availment sense and that it transacted business in the state pursuant to the long-arm statute.

8. For example, two affiants, unrelated to this litigation, aver that they have stayed at the Hotel in connection with their businesses, and have received unsolicited brochures, fliers and correspondence at their homes in Cohasset and Marlboro, Massachusetts. An affidavit of an employee of Thomas Cook Travel in Cambridge states that the Hotel submitted information and paid a fee to have its facilities listed in various hotel guides published by that agency in an effort to attract business from Thomas Cook's Massachusetts clients. Another affidavit details the inclusion of the Hotel in various publications of the Holiday Inn Priority Club sent to Massachusetts members of that organization. The Nowaks have also proffered additional promotional materials allegedly sent over the last few years by the Hotel to Massachusetts residents. Finally, they have submitted a list of approximately twenty-five advertisements placed by the Hotel between the spring of 1992 and the fall of 1994 in a quarterly publication for business travellers entitled Hotel & Travel Index. According to an attached profile, the Spring 1994 version of the index had a Massachusetts circulation of 1,901. Although not all of this evidence may be directly relevant, some of it occurring following Mrs. Nowak's

no evidence that the Nowaks or Kiddie knew of or relied upon these other contacts, they nonetheless demonstrate the Hotel's substantial attempts to do business in Massachusetts and involve itself in the economy of the state, making its appearance before courts sitting in the state fair and foreseeable. *See Good Hope,* 378 Mass. at 10 n. 17, 389 N.E.2d 76 (defendant's unrelated Massachusetts contacts "noteworthy as indicative of the defendant's intention to involve itself in Massachusetts commerce ... [and are] supportive of the plaintiff's contention that the defendant generally sought to engage in business activity in Massachusetts, and reasonably ought to be expected to defend itself here").[9]

The Court thus holds that the minimum contacts necessary to support jurisdiction exist in this case.

## C. *The Gestalt Factors*

Having determined that the Massachusetts long-arm statute applies and that minimum contacts exist, the Court must now inquire whether the assertion of jurisdiction would, "holistically viewed, offend traditional notions of 'fair play and substantial justice.'" *Pritzker v. Yari,* 42 F.3d 53, 63 (1st Cir.1994). In simpler terms, the question is whether the exercise of jurisdiction is reasonable. The First Circuit has explained:

> [T]he Due Process Clause bars a court from asserting jurisdiction over the person of a defendant if doing so would be fundamentally unfair. In this context, gauging fairness requires an assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness.... [T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing

on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness.

*Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 210 (1st Cir.1994). To guide the analysis, the Court of Appeals has identified five factors for consideration: 1) the burden on the defendant of appearing in a foreign jurisdiction; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the judicial system's interest in obtaining the most effective resolution of the controversy; and 5) the common interests of all sovereigns in promoting substantive social policies. *Pritzker,* 42 F.3d at 63–64. Consideration of these factors "illuminate[s] the equitable dimensions" of the situation before the Court. *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 150 (1st Cir. 1995).

In this case, the Gestalt factors weigh in favor of jurisdiction, and thus, according to the dictate of *Ticketmaster,* bolster the Court's determinations on relatedness and purposeful availment.[10] The ordinary cost and inconvenience of litigating in another forum is insufficient to render the first factor meaningful. Rather, under First Circuit jurisprudence, there must be "some kind of special or unusual burden." *Pritzker,* 42 F.3d at 64. The number of miles from Hong Kong to Boston, while significant, is not, by itself, sufficiently onerous to affect the constitutionality of asserting jurisdiction over the Hotel.[11] While the Court is not unmindful of

---

death, it nonetheless paints a picture of the Hotel as an eager solicitor and recipient of business from Massachusetts residents.

**9.** To like effect is evidence submitted by the Nowaks of the Hotel's continued solicitations of Kiddie business after Mrs. Nowak's death. Those efforts included a letter date July 18, 1994 from Doris Li, a Hotel Sales Executive, requesting an opportunity to visit Kiddie at its Avon headquarters in an attempt "to look after your company's hotel needs." Although there is no evidence that such a visit took place, the letter is

nonetheless forceful evidence of the Hotel's intention purposefully to avail itself of the laws and economy of Massachusetts.

**10.** This does not necessarily indicate that the case for relatedness and purposeful availment is in any sense "borderline."

**11.** Although the *Ticketmaster* court was concerned with the burden of forcing a California resident to defend himself in Massachusetts, that case was permeated, and the weighing of Gestalt

the burden thereby imposed on the Hotel, it is but an ancillary cost of doing business within this district.

The second factor, the forum state's interest, also works in the Nowaks' favor. The Commonwealth has a strong interest in protecting its citizens from out-of-state solicitations or advertisements for goods or services which prove to be unsafe. The concern of Massachusetts for the safety of its citizens does not end when the citizen crosses the border for business or personal reasons. It cannot be gainsaid that the primary function of the Commonwealth—or any other government—is to guarantee and promote the health, safety, and welfare of its citizens. MASS. CONST. pt. 1, art. 7; *id.* preamble; *see also Bowman v. Chicago,* 125 U.S. 465, 517, 8 S.Ct. 689, 710, 31 L.Ed. 700 (1888) (Harlan, J., dissenting). The state also has a " 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182. While Hong Kong also has an interest in assuring the safety of visitors and in governing the relationship between local entities and their invitees, those interests must give way to those of the Commonwealth insofar as the second factor focuses on the interest of the forum.

The third and fourth factors, the interest of the plaintiff and of the judicial system in convenient and effective relief, favor the exercise of jurisdiction by this Court. The Court must accord the Nowaks' choice of forum a measure of deference "in respect to the issue of [their] own convenience," *Pritzker,* 42 F.3d at 64, and it appears that the Nowaks' convenience is substantially enhanced by litigating here. In fact, forcing the Nowaks to litigate in Hong Kong may very well prove prohibitively burdensome.[12] *See id.* (noting "enormous inconvenience" to

plaintiff that might result from denying jurisdiction). Furthermore, the uncertain future of the Hong Kong legal system, given the island's reversion to Chinese sovereignty in less than two years, counsels heavily in favor of jurisdiction to ensure that the Nowaks have the opportunity to obtain redress, if any be appropriate, for the grievous loss they have suffered.

Finally, there are the common interests of all sovereigns involved in promoting substantive social policies. As noted, Massachusetts has a substantive social policy of protecting its citizens and providing a forum for redress of grievances. Hong Kong has a similar social policy of protecting visitors, and also seeks to protect and promote its businesses. The fifth factor is, therefore, essentially neutral in the present analysis.

In the aggregate, however, the policies promoted by the five factors will be better advanced by the exercise of jurisdiction than by its declination.

### III. Conclusion

For the reasons set forth above, the Court may and does hereby exercise jurisdiction over the defendant Tak How Investment Ltd. consistent with the Constitution and the Massachusetts long-arm statute. The motion to dismiss must therefore be DENIED.

---

factors informed, by a fear that the plaintiff may have chosen the distant forum to vex, harass, or oppress the defendant. 26 F.3d at 210–12 (inconvenience to defendant renders jurisdiction unreasonable as factor "may serve as an amulet to ward off vexatiousness and harassment"). No such concern is here present.

12. The Nowaks submit that as a family of modest means, they will not be able to retain Hong Kong

counsel if the case were to be tried there because Hong Kong does not permit its attorneys to enter into contingent fee agreements.

It is not without some irony that at the moment various interest groups seek "reform" of our American contingent fee system, this Court relies on that system as favoring the exercise of jurisdiction here in comparison to Hong Kong as it undeniably affords these individual plaintiffs access to the courts.